William LAMB, Frances Lamb, and Ronald Lamb, Plaintiffs,

v.

MARTIN MARIETTA ENERGY SYS-TEMS, INC., and Union Carbide Corporation, Defendants.

Civ. No. 90–0005 P(J).

United States District Court, W.D. Kentucky.

July 27, 1993.

Len W. Ogden, Jr., Paducah, KY, for plaintiffs.

W. Pelham McMurry, Stephen E. Smith, Jr., McMurry & Livingston, Paducah, KY, E.H. Rayson, Kramer, Rayson, Leake, Rodgers & Morgan, Knoxville, TN, and G. Wilson Horde and Donald C. Wood, Oak Ridge, TN, for defendants.

## MEMORANDUM AND ORDER

FOREMAN, Senior District Judge:

This matter is before the Court on the defendants' Motion for Summary Judgment Based on the Government Contractor Defense (Document No. 64) and Motion to Strike Plaintiffs' Claims for Punitive Damages, Strict Liability, and Jury Demand (Document No. 63). The Court has jurisdiction over this matter based upon diversity of citizenship between the parties and an amount in controversy exceeding $50,000. 28 U.S.C. § 1332(a)(1).

During oral argument of the motions, the plaintiffs moved to supplement the record with a company report entitled *Paducah Gaseous Diffusion Plant Action Plan Response to Compliance Assessment Team Findings* (November 1990). There being no objection from the defendants, the Court granted the motion and has considered the report in its ruling. Accordingly, the Court hereby **DIRECTS** the Clerk of the Court to ensure that the report is docketed as part of the record.

## I. BACKGROUND

The plaintiffs own property about two miles northwest of the Paducah Gaseous Diffusion Plant (PGDP), which produces enriched uranium for use in nuclear reactors. All three plaintiffs live on the property and plaintiff Ronald Lamb, the son of plaintiffs William and Frances Lamb, also operates an auto repair business there. Both the residence and the business depend upon water from wells on the property.

The PGDP is one of several government-owned nuclear production facilities that is operated by private companies under management and operations contracts with the government. M & O contracts are the outgrowth of certain provisions in the Atomic Energy Act which required the Atomic Energy Commission (now the Department of Energy) retain ownership of nuclear production facilities but authorized the agency to enter into contracts for the operation of the facilities. Under these contracts, the private contractor agrees to use its skills and personnel to manage and operate a facility subject to the direction and control of the DOE. Defendant Union Carbide operated the PGDP from 1951 to 1984. Defendant Martin Marietta has operated the plant under contract since 1984.

This lawsuit resulted from the discovery in August 1988 that the groundwater outside the PGDP contained a plume of contaminants that had affected several residential drinking water wells. The discovery prompted an agreement between the DOE and the Environmental Protection Agency to investigate and remediate the off-site contamination. Consultant CH2M Hill was hired to conduct the investigation.

CH2M Hill's report showed elevated levels of technetium (Tc–99) [1] and trichloroethylene (TCE) [2] in the groundwater plume, which extended in a northeasterly direction from the plant boundary. The plaintiffs' property is not within the plume and samples taken from the plaintiffs' wells showed no detectable amount of either contaminant. Remediation efforts have begun to halt any further spread of the plume. Therefore, it is uncertain whether the plume will ever reach the plaintiffs' property.

Surface water tests, however, found traces of Tc–99, plutonium (Pu239), TCE, and polychlorinated biphenyls (PCBs) in Big Bayou Creek, which runs through the plaintiffs' property. A separate investigation by the Kentucky Department of Health Services also found Tc–99 on turnip greens from the plaintiffs' garden, but showed no detectable amount on lima bean pods from the garden.

The plaintiffs' complaint sought personal injury and property damages as a result of the defendants' discharges of these materials into the soil, atmosphere, creeks, and ditches at the plant. Count I of the complaint alleged ordinary negligence. Count II was based upon strict liability, alleging that the defendants' activities are abnormally dangerous or ultrahazardous. Count III alleged private nuisance. Count IV seeks punitive damages for willful, wanton, and grossly negligent conduct.

On April 2, 1991, the defendants filed their first motion for summary judgment in the case. The Court granted the motion as to the plaintiffs' claims for personal injury, increased risk of future injury, and mental distress. The Court found that the plaintiffs had presented no evidence of personal injury or risk of future injury from the contaminants. The motion was denied as to the property damage claims. The Court noted that the plaintiffs claimed they had stopped consuming their well water and vegetables grown on their property and stopped fishing in the creek running through the property.

Therefore, the Court found that the plaintiffs had produced sufficient evidence "from which a jury could reasonably find that the defendants caused an unreasonable interference with the use and enjoyment of the plaintiffs' property, thereby causing a reduction in its market value."

The defendants subsequently filed the pending motion for summary judgment on March 26, 1993, alleging that they are entitled to judgment under the government contractor's defense. The defendants also filed a motion to strike the plaintiffs' claims for strict liability, punitive damages, and a jury trial.

## II. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

A court may grant summary judgment only where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

> The moving party has the burden of conclusively showing that no genuine issue of material fact exists.... Nevertheless, in the face of a summary judgment motion, the nonmoving party cannot rest on its pleadings but must come forward with some probative evidence to support its claim.... "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." ... The dispute must be genuine and the facts must be such that if they were proven at trial, a reasonable jury could return a verdict for the nonmoving party.... If the disputed evidence "is merely colorable or is not significantly probative, summary judgment may be granted."

---

1. Tc–99 is a radioactive byproduct of uranium fission. It was introduced to PGDP when the Atomic Energy Commission decided to use uranium residues from production reactors at Savannah River and Hanford instead of pure uranium for the PGDP's enrichment process.

2. TCE has been used as a cleaning solvent at PGDP since construction first began on the plant.

*American Academy of Ophthalmology, Inc. v. Sullivan,* 998 F.2d 377 (6th Cir.1993) (citations omitted).

■ The plaintiffs' claims in the pending lawsuit fall under the "public liability" provisions of the Price–Anderson Amendments Act of 1988, 42 U.S.C. §§ 2014(hh), 2210(n)(2).[3] Section 2210(n)(2) provides for a federal cause of action, stating that United States district courts shall have original jurisdiction over "any public liability action arising out of or resulting from a nuclear incident...." Section 2014(hh) states that "[a] public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section."

The Price–Anderson Act further provides that the Department of Energy may enter into indemnity agreements with private contractors whose activities under a DOE contract involve the risk of public liability. 42 U.S.C. § 2210(d). The Act states that as part of these agreements, the DOE may require that the contractors waive certain defenses—including negligence, contributory negligence, and governmental immunity—with respect to liability for "extraordinary nuclear occurrences."[4] *Id.* § 2210(n)(1). In other words, Congress has imposed a system of strict liability for cases involving an extraordinary nuclear occurrence. Because this case does not involve such an occurrence, however, usual defenses would apply.

The defendants' motion for summary judgment raises several defenses related to their relationship with the government. The defendants further argue that even if their conduct was otherwise actionable, the plaintiffs cannot prevail on their nuisance claim because the levels of contaminants that reached their property was de minimis.

## A. Applicability of Governmental Immunity Defenses

The defendants have raised three potential defenses in this case: (1) derivative sovereign immunity; (2) intergovernmental immunity; and (3) the government contractor's defense, which is a form of federal pre-emption. The defendants' motion for summary judgment relies only on the government contractor's defense. However, a comparison of the three theories is helpful to the resolution of the motion.

The defendants argue in their motion to strike that they are entitled to derivative sovereign immunity because the PGDP is owned by the government and because the government has agreed to indemnify the contractors for any "[j]udgments and litigation expenses" incurred in relation to their operation of the plant. Thus, the defendants contend that this case is barred by sovereign immunity because the judgment would expend itself against the federal treasury. *See, e.g., Brown v. General Servs. Admin.,* 425 U.S. 820, 826–27, 96 S.Ct. 1961, 1964–65, 48 L.Ed.2d 402 (1976) ("A suit against an officer of the United States is one against the United States itself ... 'if the judgment sought would expend itself upon the public treasury or domain, or interfere with the public administration,'... or if the effect of the judgment would be 'to restrain the Government from acting, or to compel it to act,'....").

■ However, the plaintiffs correctly point out that the Supreme Court has rejected the argument that government contractors are automatically cloaked with governmental immunity. *United States v. Boyd,* 378 U.S. 39,

---

3. Although these provisions were added in 1988, the statute provides that these sections shall be applied to nuclear incidents occurring on, before, or after the Aug. 20, 1988, effective date of the Act. All other sections are to be applied only to incidents occurring on or after the effective date. Price–Anderson Amendments Act of 1988, Pub.L. 100–408, § 20, 102 Stat. 1066, 1084 (1988).

4. The statute defines "extraordinary nuclear occurrence" as "any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damage to persons offsite or property offsite." 42 U.S.C. § 2014(j).

44, 84 S.Ct. 1518, 1522, 12 L.Ed.2d 713 (1964). In *Boyd,* the Court held that the Union Carbide Company, which is one of the defendants in the case at bar, and another contractor did not enjoy governmental immunity against state taxes even though the taxes were based upon the companies' work under a management contract with the Atomic Energy Commission. The contract in that case was similar to the contract involved in the case before this Court.

In ruling against the contractor, the Supreme Court stated that "[t]he Constitution immunizes the United States and its property from taxation by the States ... but it does not forbid a tax whose legal incidence is upon a contractor doing business with the United States, even though the economic burden of the tax, by contract or otherwise, is ultimately borne by the United States." *Id.* at 44, 84 S.Ct. at 1522. The Court expressly rejected the argument that the contractor was the equivalent of a government agent or employee. "We cannot conclude that Carbide and Ferguson, both cost-plus contractors for profit, have been so incorporated into the government structure as to become instrumentalities of the United States and thus enjoy governmental immunity." *Id.* at 48, 84 S.Ct. at 1524. Based upon the analysis in *Boyd,* this Court must reject the defendants' argument that they are entitled to derivative sovereign immunity.

The defendants' intergovernmental immunity defense arises out of the Supremacy Clause of the United States Constitution. The Supreme Court has long held that the Supremacy Clause forbids state regulation of the federal government's activities. *See McCulloch v. Maryland,* 4 Wheat. 316, 426, 4 L.Ed. 579 (1819) (involving state taxation of a federal bank). In two cases involving federal nuclear production facilities—one of which included the PGDP—the Court has further held that this intergovernmental immunity

analysis applies even if the facility is operated by a private contractor. *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 181, 108 S.Ct. 1704, 1710, 100 L.Ed.2d 158 (1988) (involved the Portsmouth Gaseous Diffusion Plant); *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976) (involved the Paducah plant). Thus, "a federally owned facility performing a federal function is shielded from direct state regulation, even though the federal function is carried out by a private contractor, unless Congress clearly authorizes such regulation." *Goodyear Atomic Corp.,* 486 U.S. at 181, 108 S.Ct. at 1710.

Based upon the limited guidance in *Goodyear,* it is unclear whether the Supreme Court would consider state tort law to be a direct regulation of the PGDP. At issue in *Goodyear* was a provision in the Ohio Constitution that an injured worker could obtain a supplemental award of workers' compensation benefits if his injury resulted from a violation of a state safety requirement. At the outset, the Court noted that "we are not presented with a direct state regulation of the operation of the [federal] facility." 486 U.S. at 181, 108 S.Ct. at 1710. However, Goodyear and the Solicitor General argued that the supplemental award provision was "tantamount" to a regulation.

The Court declined to decide this issue because "even if the provision is sufficiently akin to direct regulation" of the facility, Congress had provided clear authorization for the regulation. *Id.* at 182, 108 S.Ct. at 1710.[5] The Court stated that Congress had expressly authorized states to apply their workers' compensation laws to all lands and premises owned by the United States "in the same way and to the same extent as if said premises were under the exclusive jurisdiction of the State...." *Id.* Goodyear and the Solicitor General argued that Congress had re-

---

5. Justices White and O'Connor dissented from the Court's opinion. In their view, the state law was tantamount to direct regulation of the facility because the law would exact a monetary penalty for failure to comply with state laws and regulations. *Id.* at 188–93. The dissenters further argued that when Congress authorized the states to enforce their workers' compensation laws at federal facilities, the intent was merely to correct the situation where workers employed on federal projects were deprived of the benefits of coverage simply because of the location of their injury. *Id.* at 193–95. They argued that Congress did not intend to expose federal facilities to the detailed and mandatory regulation that would occur through the supplemental award law. *Id.*

jected a proposal that would have authorized states to apply state safety and insurance laws directly to federal projects. Therefore, they contended that Congress did not intend to allow states to regulate the safety aspects of federal projects. The Court disagreed.

Congress' reluctance to allow direct state regulation of federal projects says little about whether Congress was likewise concerned with the incidental regulatory effects arising from the enforcement of a workers' compensation law, like Ohio's, that provides an additional award when the injury is caused by the breach of a safety regulation. The effects of direct regulation on the operation of federal projects are significantly more intrusive than the incidental regulatory effects of such an additional award provision. Appellant may choose to disregard Ohio safety regulations and simply pay an additional workers' compensation award if an employee's injury is caused by a safety violation. We believe Congress may reasonably determine that incidental regulatory pressure is acceptable, whereas direct regulatory authority is not.

*Id.* at 185–86, 108 S.Ct. at 1712–13.

Although this discussion suggests a distinction between direct and indirect effects of state law, it is important to note that the discussion appears in the Court's analysis of whether Congress had approved of such state regulation—not whether this type of law implicates the Supremacy Clause in the first place.[6] Moreover, while the majority opinion sidestepped the issue, the dissent argued that the state law clearly amounts to regulation of the federal installation because "the principal effect of this provision can only be to induce the employer to adhere to each of the various health and safety regulations that the State has adopted." *Id.* at 192, 108 S.Ct. at 1716.

■ The Supreme Court's precedents suggest that the key issue in determining whether a state law impermissibly regulates a federal enterprise is whether the state law effectively controls the enterprise. *See McCulloch v. Maryland,* 4 Wheat 316, 436, 4 L.Ed. 579 (1819) ("the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government."). The *Goodyear* decision underscores this interpretation by rejecting an argument that the earlier *Hancock* decision should be interpreted as applying only to situations where the state regulation acts to prohibit the operation of a federally owned facility.

Although *Hancock* involved a state regulation requiring an operating permit, the central issue presented was the power of the State to enforce its emissions regula-

---

**6.** The Court notes that the Supreme Court has relied upon this direct vs. indirect analysis in several other cases. For example, in *Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), a sharply divided Court held that punitive damages could be recovered in a state law cause of action brought by Karen Silkwood's estate against a federally licensed nuclear facility. In reaching this decision, the Court found that even though Congress had pre-empted the field of nuclear safety regulation, Congress did not intend to displace state tort law. 464 U.S. at 256, 104 S.Ct. at 625–26. "It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept." *Id.*

This decision is of limited value to the present case, however, because it was based upon a somewhat different Supremacy Clause analysis.

*Silkwood* involved a privately owned and operated facility which was merely subject to federal regulation, as opposed to the government-owned facility operated by a private contractor. In the case of a private facility, the Supremacy Clause analysis focuses on pre-emption—i.e., whether Congress has taken affirmative action to pre-empt state regulation. *Goodyear Atomic Corp.,* 486 U.S. at 180 n. 1, 108 S.Ct. at 1710 n. 1. Where a federal facility is involved, no direct state regulation is allowed unless Congress has clearly authorized such regulation. *Id.* Thus, in essence, state law enjoys a presumption of validity where private facilities are involved but are presumptively invalid against federally owned facilities. Based upon this distinction, it is one thing to say that Congress did not pre-empt the application of state tort law where private facilities are involved, but an entirely different question as to whether this is the type of regulation that cannot be imposed against government-owned facilities without express congressional approval.

tions.... Under the Supremacy Clause, we discern no important difference between the authority to order compliance with state regulations and the authority to require a permit prior to operating a facility. *In both settings the State is claiming the authority to dictate the manner in which the federal function is carried out.* 486 U.S. at 181 n. 3, 108 S.Ct. at 1710 n. 3 (emphasis added).

■ Under this analysis, the Court finds that there are some circumstances in which state tort law would improperly regulate a federal facility. The most obvious situation is where state law is based upon a standard of care that is inconsistent with the federal laws, regulations, or other orders or directions governing the operation of the facility. Thus, several courts have held that a contractor cannot be held liable for conduct that comports with federal guidelines. *See, e.g., O'Conner v. Commonwealth Edison Co.,* 748 F.Supp. 672, 675–78 (C.D.Ill.1990) (adopting federal permissible dose limits as the standard of care owed by defendants), *certification for interlocutory appeal denied,* No. 90–8103 (7th Cir. Oct. 26, 1990).

On the other hand, state law would not impermissibly regulate or control a federal facility if the state law standard of care is the same as, or consistent with, federal law. In this situation, the state law does not dictate the manner in which the federal function is carried out; it merely allows a plaintiff to recover damages for breach of the federally imposed duty. Accordingly, the Court holds that federal facilities are not entirely exempt from state tort law under the intergovernmental immunity principles, but that state tort law may not apply a standard of care that is inconsistent with any applicable federal laws and guidelines. ·

■ The defendants' final theory is based upon a form of federal pre-emption. Generally, the courts have applied the pre-emption doctrine only where there is a clear congressional prescription or a direct conflict between state and federal law. *See Boyle v. United Technologies Corp.,* 487 U.S. 500, 504, 108 S.Ct. 2510, 2514, 101 L.Ed.2d 442 (1988). However, the Supreme Court has also held that "a few areas, involving 'uniquely federal interests,'... are so committed by the Constitution and laws of the United States to federal control that state law is pre-empted and replaced, where necessary, by federal law of a content prescribed (absent explicit statutory directive) by the courts—so called 'federal common law.'" *Id.* Under this latter theory, federal law pre-empts state law where (1) the action involves a uniquely federal interest; and (2) that "a 'significant conflict' exists between an identifiable 'federal policy or interest and the [operation] of state law,'... or the application of state law would 'frustrate specific objectives' of federal legislation." *Id.* at 507, 108 S.Ct. at 2516.

There can be no real dispute as to whether a suit involving the operations of a nuclear production facility involves a uniquely federal interest. As the Supreme Court pointed out in *Goodyear,* "[w]ith certain limited exceptions, the DOE, as agent of the United States, is the *exclusive* owner of all nuclear production facilities.... This federal control over the production of nuclear material is an important aspect of federal nuclear energy policy." 486 U.S. at 181 n. 2, 108 S.Ct. at 1710 n. 2 (emphasis added) (citations omitted). Thus, state tort law is pre-empted if it represents a significant conflict with federal policy.

In the landmark 1988 decision of *Boyle v. United Technologies Corp.,* the Supreme Court held that a significant conflict arises when the duties alleged under state tort law are contrary to the federal interests identified in the Federal Tort Claims Act (FTCA). 487 U.S. 500, 511–12, 108 S.Ct. 2510, 2518 (1988). The Court noted that under the FTCA, the federal government waived its sovereign immunity with respect to actions based upon the negligent or wrongful conduct of government employees. Thus, damages could be recovered from the government to the extent that a private person would be liable under state law. However, the FTCA expressly retained the government's immunity against claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not

the discretion involved be abused." 28 U.S.C. § 2680(a).

At issue in *Boyle* was whether a government contractor could be held liable for designing a helicopter with an escape hatch that opened out instead of in (making it ineffective in a submerged craft because of water pressure). The Court found that selection and design of military equipment falls within the government's discretionary function. Therefore, the Court held that a significant conflict exists in some circumstances where state law would hold government contractors liable for design defects in military equipment. Accordingly, the Court held that "[l]iability for design defects in military equipment cannot be imposed, pursuant to state law, when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." 487 U.S. at 512, 108 S.Ct. at 2518.

■ The plaintiff argues that this defense, known as the "government contractor defense," is applicable only to military procurement contracts. The Court acknowledges that the federal courts are split on this issue. *See Carley v. Wheeled Coach,* 991 F.2d 1117, 1119 n. 1 (3d Cir.1993) (listing cases). However, the Third Circuit's decision finding the defense applicable to non-military contractors appears to be the most well-reasoned. *Id.* at 1119–25. As that court pointed out, the Supreme Court's rationale for applying the government contractor defense in *Boyle* is equally applicable in non-military as well as military settings.[7] Accordingly, this Court finds that the defense may be applied to the case at bar.

## B. Application of the Government Contractor's Defense

■ The defendants have the burden of proving that they are entitled to judgment based upon the government contractor's defense. Therefore, on a motion for summary judgment, the defendants must come forward with evidence that would entitle them to a directed verdict if the evidence went uncontroverted at trial. *Bailey v. McDonnell Douglas Corp.,* 989 F.2d 794 (5th Cir.1993).

The defendants have presented evidence that the Department of Energy and its predecessors exercised substantial control over the contractors who operated the PGDP and other nuclear production facilities. *See generally* Keller Deposition and Affidavit; Allen Affidavit. While the contractor was responsible for the day-to-day operations of the plant, the contractor was required to follow the DOE's directions and instructions, and the DOE maintained close supervision over the contractor's work. In essence, the defendants argue that nothing was done at the plant without DOE consent or approval and, therefore, all activities at the plant would fall within the government's discretionary function immunity.

■ This argument is deficient for two reasons. First, assuming that the DOE personnel gave its approval for every activity at the plant, such approval does not necessarily constitute a discretionary function. "[C]onduct cannot be discretionary unless it involves an element of judgment or choice.... Moreover, assuming that the challenged conduct involves an element of judgment, a court must determine whether that judgment is of a kind that the discretionary function exception was designed to shield." *Berkovitz v. United States,* 486 U.S. 531, 536–37, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988).

---

7. Similarly, this Court finds no reason to limit *Boyle* to procurement contracts, as opposed to performance contracts as is involved in the case at bar. In fact, *Boyle's* rationale was based largely upon the Supreme Court's earlier decision in *Yearsley v. W.A. Ross Construction Co.,* 309 U.S. 18, 60 S.Ct. 413, 84 L.Ed. 554 (1940), which rejected an attempt by a landowner to hold a contractor liable under state law for erosion caused by the contractor's work in constructing dams for the government. The Court stated that "if [the] authority to carry out the project was validly conferred, that is, if what was done was within the constitutional power of Congress, there is no liability on the part of the contractor for executing its will." *Id.* at 20–21, 60 S.Ct. at 414–15. The Court followed this analysis in Boyle, stating that "the federal interest justifying this holding surely exists as much in procurement contracts as in performance contracts; we see no basis for a distinction." 487 U.S. at 506, 108 S.Ct. at 2515.

As the *Berkovitz* decision points out, the exception was based upon "Congress' desire to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort.'" *Id.* Thus, the exception "protects only governmental actions and decisions based on considerations of public policy." *Id.* at 537, 108 S.Ct. at 1959.

Under this analysis, it is not enough to show that a government official had approved of the plant's activities; the defendants must show that the government official's approval involved the permissible exercise of policy judgment. In making this determination, it is important to keep in mind that "the discretionary function exception does not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow. In this event, the employee has no rightful option but to adhere to the directive." *Id.* at 536, 108 S.Ct. at 1958; *cf. Crawford v. National Lead Co.,* 784 F.Supp. 439, 446–47 (S.D.Ohio 1989) (finding that where defendants have violated federal environmental laws, there is no significant conflict to preclude state tort law claims for this conduct).

The second flaw in the defendants' argument is that even if the DOE had approved of all activities that were to take place at the plant, the defendants have failed to show that contractor personnel faithfully adhered to all DOE's orders. The government did not have man-to-man oversight of the plant operations. Keller Deposition, at 37–38. Thus, despite the general practice or custom, contract personnel may have engaged in conduct that was not approved or condoned by the agency. In fact, the plaintiff has presented evidence that shows that the contractor did not always follow DOE orders. For example, a company report found, *inter alia,* that "[t]he PGDP Environmental Surveillance Program is not designed or implemented in a manner that meets the requirements of applicable DOE orders." *Paducah Gaseous Diffusion Plant Action Plan Response to Compliance Assessment Team Findings* (hereinafter the *Tiger Team Report* ), at 5–125 (November 1990). The report identifies

one of the root causes of this deficiency as "PGDP has not implemented formal and comprehensive programs that control key elements of environmental protection." *Id.*

The report also states that

PGDP is not implementing a formal liquid radiological effluent control program with the monitoring and control elements necessary to ensure that the requirements of the DOE 5400 series orders are met. Consequently, the site's knowledge of the source, transport, and characteristics of liquid effluents is insufficient to effectively control liquid releases and to implement the as low as reasonably achievable (ALARA) process.

*Id.* at 5–136. Based upon this evidence, the Court must reject the defendants' attempt to satisfy the second requirement of the government contractor defense—i.e., that the contractor conformed to the government's specifications—through evidence of a general custom.

In contrast to the generalized evidence, the defendants have presented more specific evidence regarding some of the activities at the plant. For example, Steven Shell, the manager of PGDP's environmental and waste management division, states that plant records show that the plant's releases of radionuclides (including technetium, uranium and plutonium) have not exceeded the levels established by the DOE and its predecessors. Shell Affidavit ¶ 5; Shell Deposition, at 71. It is unclear, however, whether these records reflect only intentional discharges of these materials or whether the records also reflect unintentional discharges such as the leakage from the plant's waste burial sites or the Tc–99 that was vented into the atmosphere because the magnesium fluoride traps on purge cascade vents were not regularly serviced from 1964 to 1975. Moreover, as stated above, the Tiger Team report found deficiencies in the plant's monitoring and control of liquid effluents. The report also stated that "[o]utfall flow rates are being underestimated because PGDP sampling crews improperly estimate flow rates...." *Tiger Team Report,* at 5–55. Thus, the plaintiff argues that the company's records concerning its discharges are unreliable.

In addition, Shell admitted in his deposition that the plant had exceeded the guidelines for TCE on one occasion and for PCBs on two or three occasions. Shell Deposition, at 8–13, 72–73. The defendants argue that even though the plant received notices of violation for these discharges, these notices are "not the equivalent of a major violation of environmental laws...." Shell Affidavit ¶ 14.

A Notice does not automatically result in fines or assessments; rather, when a Notice is issued, the cause for the permit exceedance or condition is determined and explained to the issuing agency. If a condition which is within the control of the permittee caused the exceedance, it is corrected. Once the reason for the exceedance is explained and/or the condition is corrected to the satisfaction of the issuing agency, the matter is "closed." It is only when a violation is recurring or there is a situation that remains unsatisfactory to the issuing agency that fines or penalties are assessed.

*Id.*

Because no fines or penalties have been assessed against the plant, the defendants argue that they cannot be held liable for the discharges above the permit levels. This argument, however, misapprehends the distinction between the imposition of administrative fines and the compensatory function of tort law. Under either system, the notice of violation proves that the plant exceeded its permit levels. Under the administrative system, the governmental agency has the discretion to impose a fine if a violation which is within the control of the plant is not corrected. Tort law allows a plaintiff to recover for any damages caused by excessive discharges which resulted from the defendants' negligence. Therefore, even though a regulatory agency declines to impose fines or penalties for exceeding the permit levels, the violator may still be held liable in tort for the damage caused by the violation.

The defendants have failed to present specific evidence regarding the directions and orders that the DOE gave with respect to the waste management units at the plant. The CH2M Hill report lists a number of waste management units that are potential sources for offsite contamination. *See* Exhibit 2 Accompanying Plaintiff's Response to the Motion for Summary Judgment. The defendants have presented only general information that the DOE approved of the location, use, and maintenance of these sites. *See, e.g.,* Keller Deposition at 52–76. As explained above, this evidence is insufficient to establish that the defendants were following reasonably precise orders with respect to the precise actions that caused the offsite contamination.

In addition, the evidence suggests that Martin Marietta had been aware of elevated beta levels in both onsite and offsite wells, which would suggest the presence of Tc–99 or other radionuclides, but had failed to conduct any further testing to determine whether such contaminants were in fact present in the offsite wells. Shell Deposition at 30–60; Montgomery Deposition at 18–20. The evidence also presents a question of fact as to whether the defendant promptly notified the DOE about the problem. Although elevated beta levels had been detected in an onsite well in 1987, the contractor did not make a full presentation to the DOE on the issue until the summer of 1988. *See* Exhibit 12 Accompanying Plaintiff's Response to Motion for Summary Judgment; Shell Deposition at 60–61. Thus, there is a question as to whether the defendant satisfies the third element of the government contractor defense.

For these reasons, the Court concludes that the defendants are not entitled to summary judgment based upon the government contractor's defense.

## C. De Minimis Contamination Levels

The defendants argue that even if their conduct fell below the appropriate standards, the level of contaminants that has invaded the plaintiffs' property as a result of the defendants' conduct is de minimis and, therefore, not actionable under a private nuisance theory. In support of this argument, the defendants cite to several courts that have refused to allow plaintiffs to recover damages in a nuisance action where the evidence shows that the level of contaminants poses no health risk. *See, e.g., Graham v. Canadian Nat'l Ry. Co.,* 749 F.Supp. 1300, 1320 (D.Vt.

1990) (dosage of chemicals that reached the plaintiffs' home "was not shown to have been harmful to human, plant, and animal life by the required measure of reasonable certainty."); *Bradley v. American Smelting & Refining Co.*, 635 F.Supp. 1154, 1157–58 (W.D.Wash.1986) (finding "no invasion or threatened invasion of plaintiffs' security because ... the evidence indicates no health risk" from small amounts of contaminants found on plaintiffs' land).

The Court finds these cases consistent with the rule set forth in the Restatement (Second) of Torts. Section 821F of the Restatement states that "[t]here is liability for a nuisance only to those to whom it causes significant harm, of a kind that would be suffered by a normal person in the community or by property in normal condition and used for a normal purpose." Restatement (Second) of Torts § 821F (1979).

> By significant harm is meant harm of importance, involving more than slight inconvenience or petty annoyance. The law does not concern itself with trifles, and therefore there must be a real and appreciable invasion of the plaintiff's interests before he can have an action for either a public or a private nuisance.

*Id.* comment c.

The Court notes that some courts have allowed recovery in a nuisance claim based upon the public's perception of contamination even though such perception may be unfounded. *See, e.g., DeSario v. Industrial Excess Landfill, Inc.*, 68 Ohio App.3d 117, 129, 587 N.E.2d 454, 461 (1991) (holding that a class action nuisance suit "may be premised on the public's perception of contamination irrespective of actual land contamination."); *Allen v. Uni–First Corp.*, 151 Vt. 229, 558 A.2d 961, 963–64 (1988) (finding that trial court failed to properly instruct the jury regarding damages based on evidence of public perception of widespread contamination). However, the Supreme Court of Michigan, in a detailed and well-reasoned decision, held that plaintiffs could not recover in nuisance for diminution in value of property due to public's unfounded fears about dangers from contamination. *Adkins v. Thomas Sol-*

*vent Co.*, 440 Mich. 293, 487 N.W.2d 715 (1992).

> The crux of the plaintiffs' complaint is that publicity concerning the contamination of groundwater in the area (although concededly not their groundwater) caused diminution in the value of the plaintiffs' property. This theory cannot form the basis for recovery because negative publicity resulting in unfounded fear about dangers in the vicinity of the property does not constitute a significant interference with the use and enjoyment of land.

*Id.* at 306, 487 N.W.2d at 721.

■ The Court finds the Michigan decision to be persuasive. Moreover, even stronger reasons for denying such recovery exist in this case because the contaminants have emanated from a federally owned facility. As explained above, both the intergovernmental immunity and federal pre-emption doctrines would preclude imposing liability upon a contractor operating a government-owned facility if the contractor is in compliance with applicable federal law. A state law that allows recovery where the level of contaminants is well below federally mandated safety levels would run afoul of both principles.

Applying these principles to the case at bar, the Court notes that the defendants have presented evidence that the plume of contaminants in the groundwater is moving in a northeasterly direction from the plant. Because the plaintiffs' property lies to the northwest of the plant and because the plume is moving to the northeast, geologist Thomas O. Early states that "it is extremely unlikely, even without any remedial action being taken on the part of Energy Systems, that this contamination will ever touch the plaintiff's property. Moreover, remedial action is contemplated, subject to the approval of the Environmental Protection Agency, which will minimize or eliminate whatever remote possibility exists that it could reach the plaintiffs' property." Early Affidavit, ¶ 7.

■ This testimony does not entirely rule out the possibility that the plume might affect the plaintiffs' property sometime in the

future. However, the plaintiffs concede that in order to prevail on a nuisance claim under Kentucky law, there must be a physical invasion or a physical "touching" of the plaintiff's property. *See McGinnis v. Tennessee Gas Pipeline Co.,* No. 91–49, slip. op. at 5 (U.S.Dist.Ct., E.D.Ky. July 29, 1992) ("Kentucky courts have consistently rejected claims for diminution of the value of property allegedly caused by undesirable activities nearby where a defendant's conduct has not physically invaded or harmed the plaintiff's property.").

The plaintiffs argue that they have evidence that the contamination in the groundwater plume has affected their property. The evidence they rely upon is a graphic produced by CH2M Hill which shows some concentration of Tc–99 at a well on the plaintiff's property. *See* Exhibit 1 Accompanying Document No. 49. However, a company witness has testified that the graphic was based upon incorrect data in CH2M Hill's preliminary report. *See* Montgomery Deposition, Document No. 61, at 30–34. The plaintiff has presented no evidence to contradict these findings. Therefore, the Court finds that there is no evidence to show that the contaminated groundwater plume has affected the plaintiffs' property. Accordingly, the groundwater contamination cannot form the basis for the plaintiffs' nuisance claim.

The defendants also have presented evidence from several experts who state that the levels of radionuclides found in Big Bayou Creek and on the turnip greens from the plaintiffs' garden are well below the radiation dosage limits set by the DOE and the Environmental Protection Agency. Auxier Affidavit ¶ 4; Hoffman Affidavit ¶¶ 4–6.[8] The plaintiff argues that the CH2M Hill investigation found at least one reading of plutonium (Pu–239) in Big Bayou Creek which exceeded the acceptable level established by the Safe Drinking Water Act. *See* Exhibit 2 Accompanying Hoffman Affidavit (shows reading of 17 picocuries per liter of Pu–239 at the BBC7 sampling station). However, the defendants point out that this reading did not occur on the plaintiffs' property; rather,

it came from another location on the creek. The defendants' experts further state that even taking the highest levels of contamination found in the water and sediment, the resulting exposure to humans would be at least 30 to 100 times lower than the EPA and DOE standards for acceptable levels of exposure to radionuclides. Hoffman Affidavit ¶¶ 2–4.

Finally, the defendants' expert states that the CH2M Hill investigation found no PCBs in the sediment, waters or streambanks of Big Bayou Creek. *Id.* ¶ 7. The investigation also did not detect any PCBs in the fish in the creek. *Id.* The expert acknowledged that a separate study found that 5 percent of 159 fish collected from the Big Bayou Creek had PCBs at levels above the FDA limit for fish commercially sold. *Id.* However, the expert's uncontradicted testimony is that the levels of PCBs in the fish demonstrate that the levels of PCBs in the water itself would be much lower than the Safe Drinking Water Act limit of 0.5 parts per billion. The expert does not explain this phenomenon. However, PCBs by definition are "pollutants which tend to accumulate in animal tissues." Webster's Ninth New Collegiate Dictionary, at 912 (1991). Thus, the amount of PCBs found in the fish tissues would tend to be greater than the levels of PCBs in the water and sediments themselves. Therefore, the presence of PCBs in the fish does not indicate that the plant's effluents exceeded the federal standards.

Based upon the foregoing analysis, the Court agrees with the defendants that the impact of the plant's emissions on the plaintiffs' property have been de minimis. Therefore, the plaintiffs cannot prove that they have suffered a significant harm, as required to prevail on their nuisance claim. Accordingly, the Court hereby **GRANTS** the defendants' motion for summary judgment on this claim.

### III. DEFENDANTS' MOTION TO STRIKE

The defendants' second motion asks the Court to strike the plaintiffs' claims for strict

---

8. Neither expert addresses the potential risks of TCE. However, the plaintiffs conceded during oral argument that they were not contending that their property has been affected by TCE.

liability, punitive damages, and a jury trial. In support of this motion, the defendants argue that the plaintiffs' complaint constitutes an action against the United States. Therefore, they contend that the defendants share the government's immunity from punitive damages, strict liability, and requests for a jury trial.

As explained above, a private contractor is not automatically cloaked with governmental immunity. However, as explained more fully below, the Court finds that the plaintiffs' strict liability claim is precluded under the defendants' alternative theories of intergovernmental immunity and federal pre-emption. Because this finding disposes of the plaintiffs' final claim against the defendants, it is unnecessary to discuss the defendants' arguments concerning the plaintiffs' request for punitive damages and a jury trial.

 The Supreme Court has long held that the Federal Tort Claims Act does not authorize suit against the government based upon strict liability for ultrahazardous activities. *Laird v. Nelms*, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972); *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). Although the plaintiffs' claim is against private contractors and not against the government, it is important to remember that strict liability claims are based upon the ultrahazardous nature of the activity and not upon the reasonableness of the defendants' conduct while engaged in that activity. Therefore, even though the government is not a defendant in this case, the strict liability claim is, in reality, based upon the government's operation of the PGDP. As a result, it would thwart the government's retained immunity against strict liability if the plaintiffs were allowed to pursue this type of claim against the contractors.

 Strict liability also runs afoul of the discretionary function exception to the FTCA. As explained above, the defendants were required to operate the plant according to the government's orders. Recovery under a strict liability theory would hold the defendants responsible even if their actions were in full compliance with government policy decisions. Therefore, based upon the discre-

tionary function exception to the FTCA as well as the strict liability exception, a significant conflict exists between federal law and state law and requires pre-emption of the latter.

 Even if the strict liability were not precluded under this analysis, the Court finds that Kentucky law would not recognize a cause of action for strict liability because the activity is carried on in pursuance of a public necessity. *See Kentucky Utils. Co. v. Auto Crane Co.*, 674 S.W.2d 15 (Ky.Ct.App. 1983) ("the rules for strict liability for abnormally dangerous activities rarely apply to activities carried on in performance of a public duty."); *see also* Restatement (Second) of Torts § 521 (1977) ("The rules as to strict liability for abnormally hazardous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier.").

The PGDP is one of only two plants in the country that produce enriched uranium. This product is used both in commercial reactors as well as in weapons production. Because the plant plays an integral role in the nation's defense and domestic energy programs, the Court finds that the plant's activities are carried on in pursuance of a public necessity. Therefore, Kentucky law would not provide a strict liability cause of action.

For these reasons, the Court hereby **GRANTS** the defendants' motion to strike the plaintiffs' strict liability claim.

## IV. SUMMARY

The Court **DIRECTS** the Clerk of the Court to ensure that plaintiff's exhibit entitled *Paducah Gaseous Diffusion Plant Action Plan Response to Compliance Assessment Team Findings* (November 1990) is docketed as part of the record.

The Court **GRANTS** the defendants' Motion for Summary Judgment (Document No. 64) and **GRANTS** the defendants' Motion to Strike (Document No. 63) with respect to the plaintiffs' strict liability claim in Count II. These rulings, coupled with the Court's prior decision granting summary judgment on the

plaintiffs' personal injury claims, dispose of all of the claims in the plaintiffs' complaint. Accordingly, the Court hereby **DIRECTS** the Clerk of the Court to enter a final judgment in favor of the defendants and against the plaintiffs.

**IT IS SO ORDERED.**