[No. 32630.   Department One.   March 19, 1954.]

B. W. FOSTER, *Respondent,* v. PRESTON MILL COMPANY,
*Appellant.*[1]

*Kahin, Carmody & Horswill* and *Pinckney M. Rohrback,*
for appellant.

*John B. Speer,* for respondent.

HAMLEY, J.—Blasting operations conducted by Preston
Mill Company frightened mother mink owned by B. W.
Foster, and caused the mink to kill their kittens. Foster
brought this action against the company to recover dam-
ages. His second amended complaint, upon which the case
was tried, sets forth a cause of action on the theory of
absolute liability, and, in the alternative, a cause of action
on the theory of nuisance.

[1]Reported in 268 P. (2d) 645.

After a trial to the court without a jury, judgment was rendered for plaintiff in the sum of $1,953.68. The theory adopted by the court was that, after defendant received notice of the effect which its blasting operations were having upon the mink, it was absolutely liable for all damages of that nature thereafter sustained. The trial court concluded that defendant's blasting did not constitute a public nuisance, but did not expressly rule on the question of private nuisance. Plaintiff concedes, however, that, in effect, the trial court decided in defendant's favor on the question of nuisance. Defendant appeals.

Respondent's mink ranch is located in a rural area one and one-half miles east of North Bend, in King county, Washington. The ranch occupies seven and one-half acres on which are located seven sheds for growing mink. The cages are of welded wire, but have wood roofs covered with composition roofing. The ranch is located about two blocks from U. S. highway No. 10, which is a main east-west thoroughfare across the state. Northern Pacific Railway Company tracks are located between the ranch and the highway, and Chicago, Milwaukee, St. Paul & Pacific Railroad Company tracks are located on the other side of the highway about fifteen hundred feet from the ranch.

The period of each year during which mink kittens are born, known as the whelping season, begins about May 1st. The kittens are born during a period of about two and one-half weeks, and are left with their mothers until they are six weeks old. During this period, the mothers are very excitable. If disturbed by noises, smoke, or dogs and cats, they run back and forth in their cages and frequently destroy their young. However, mink become accustomed to disturbances of this kind, if continued over a period of time. This explains why the mink in question were apparently not bothered, even during the whelping season, by the heavy traffic on U. S. highway No. 10, and by the noise and vibration caused by passing trains. There was testimony to the effect that mink would even become accustomed to the vibration and noise of blasting, if it were carried on in a regular and continuous manner.

Appellant and several other companies have been engaged in logging in the adjacent area for more than fifty years. Early in May, 1951, appellant began the construction of a road to gain access to certain timber which it desired to cut. The road was located about two and one-quarter miles southwest of the mink ranch, and about twenty-five hundred feet above the ranch, along the side of what is known as Rattlesnake Ledge.

It was necessary to use explosives to build the road. The customary types of explosives were used, and the customary methods of blasting were followed. The most powder used in one shooting was one hundred pounds, and usually the charge was limited to fifty pounds. The procedure used was to set off blasts twice a day—at noon and at the end of the work day.

Roy A. Peterson, the manager of the ranch in 1951, testified that the blasting resulted in "a tremendous vibration, is all. Boxes would rattle on the cages." The mother mink would then run back and forth in their cages, and many of them would kill their kittens. Peterson also testified that on two occasions the blasts had broken windows.

Appellant's expert, Professor Drury Augustus Pfeiffer, of the University of Washington, testified as to tests made with a pin seismometer, using blasts as large as those used by appellant. He reported that no effect on the delicate apparatus was shown at distances comparable to those involved in this case. He said that it would be impossible to break a window at two and one-fourth miles with a hundred-pound shot, but that it could cause vibration of a lightly-supported cage. It would also be audible. Charles E. Erickson, who had charge of the road construction for appellant in 1951, testified that there was no glass breakage in the portable storage and filing shed which the company kept within a thousand feet of where the blasting was done. There were windows on the roof as well as on the sides of this shed.

Before the 1951 whelping season had far progressed, the mink mothers, according to Peterson's estimate, had killed thirty-five or forty of their kittens. He then told the man-

ager of appellant company what had happened. He did not request that the blasting be stopped. After some discussion, however, appellant's manager indicated that the shots would be made as light as possible. The amount of explosives used in a normal shot was then reduced from nineteen or twenty sticks to fourteen sticks.

Officials of appellant company testified that it would have been impractical to entirely cease road-building during the several weeks required for the mink to whelp and wean their young. Such a delay would have made it necessary to run the logging operation another season, with attendant expense. It would also have disrupted the company's log production schedule and consequently the operation of its lumber mill.

In this action, respondent sought and recovered judgment only for such damages as were claimed to have been sustained as a result of blasting operations conducted after appellant received notice that its activity was causing loss of mink kittens.

The primary question presented by appellant's assignments of error is whether, on these facts, the judgment against appellant is sustainable on the theory of absolute liability.

The modern doctrine of strict liability for dangerous substances and activities stems from Justice Blackburn's decision in *Rylands v. Fletcher,* 1 Exch. 265, decided in 1866 and affirmed two years later in *Fletcher v. Rylands,* L.R. 3 H.L. 330. Prosser on Torts, 449, § 59. As applied to blasting operations, the doctrine has quite uniformly been held to establish liability, irrespective of negligence, for property damage sustained as a result of casting rocks or other debris on adjoining or neighboring premises. *Patrick v. Smith,* 75 Wash. 407, 134 Pac. 1076; *Schade Brewing Co. v. Chicago, M. & P. S. R. Co.,* 79 Wash. 651, 140 Pac. 897; *Bedell v. Goulter,* 199 Ore. 344, 261 P. (2d) 842; *Exner v. Sherman Power Constr. Co.,* 54 F. (2d) 510. But, see *Klepsch v. Donald,* 4 Wash. 436, 30 Pac. 991.

There is a division of judicial opinion as to whether the doctrine of absolute liability should apply where the dam-

age from blasting is caused, not by the casting of rocks and debris, but by concussion, vibration, or jarring. 92 A. L. R. 741, annotation. This court has adopted the view that the doctrine applies in such cases. *Patrick v. Smith, supra.* In the *Patrick* case, it was held that contractors who set off an exceedingly large blast of powder, causing the earth for a considerable distance to shake violently, were liable to an adjoining owner whose well was damaged and water supply lost, without regard to their negligence in setting off the blast, although there was no physical invasion of the property. For excellent expositions of this view, see *Exner v. Sherman Power Constr. Co., supra*; and *Bedell v. Goulter, supra.*

However the authorities may be divided on the point just discussed, they appear to be agreed that strict liability should be confined to consequences which lie within the extraordinary risk whose existence calls for such responsibility. Prosser on Torts, 458, § 60; Harper, Liability Without Fault and Proximate Cause, 30 Mich. L. Rev. 1001, 1006; 3 Restatement of Torts, 41, § 519. This limitation on the doctrine is indicated in the italicized portion of the rule as set forth in Restatement of Torts, *supra*:

"Except as stated in §§ 521-4, one who carries on an ultrahazardous activity is liable to another whose person, land or chattels the actor should recognize as likely to be harmed by the unpreventable miscarriage of the activity for harm resulting thereto *from that which makes the activity ultrahazardous*, although the utmost care is exercised to prevent the harm." (Italics ours.)

This restriction which has been placed upon the application of the doctrine of absolute liability is based upon considerations of policy. As Professor Prosser has said:

"It is one thing to say that a dangerous enterprise must pay its way within reasonable limits, and quite another to say that it must bear responsibility for every extreme of harm that it may cause. The same practical necessity for the restriction of liability within some reasonable bounds, which arises in connection with problems of 'proximate cause' in negligence cases, demands here that some limit be set . . . . This limitation has been expressed by saying

that the defendant's duty to insure safety extends only to certain consequences. More commonly, it is said that the defendant's conduct is not the 'proximate cause' of the damage. But ordinarily in such cases no question of causation is involved, and the limitation is one of the policy underlying liability." Prosser on Torts, 457, § 60.

Applying this principle to the case before us, the question comes down to this: Is the risk that any unusual vibration or noise may cause wild animals, which are being raised for commercial purposes, to kill their young, one of the things which make the activity of blasting ultrahazardous?

We have found nothing in the decisional law which would support an affirmative answer to this question. The decided cases, as well as common experience, indicate that the thing which makes blasting ultrahazardous is the risk that property or persons may be damaged or injured by coming into direct contact with flying debris, or by being directly affected by vibrations of the earth or concussions of the air.

Where, as a result of blasting operations, a horse has become frightened and has trampled or otherwise injured a person, recovery of damages has been upheld on the theory of negligence. *Klein v. Phelps Lbr. Co.*, 75 Wash. 500, 135 Pac. 226; *Peterson v. General Geophysical Co.*, 185 P. (2d) (Cal. Dist. Ct.) 56; *Bassett v. Moberly Paving Brick Co.*, 219 Mo. App. 81, 268 S. W. 645; *Missouri Iron & Metal Co. v. Cartwright*, 207 S. W. (Tex.) 397. *Contra: Uvalde Constr. Co. v. Hill*, 142 Tex. 19, 175 S. W. (2d) 247, where a milkmaid was injured by a frightened cow. But we have found no case where recovery of damages caused by a frightened farm animal has been sustained on the ground of absolute liability.

If, however, the possibility that a violent vibration, concussion, or noise might frighten domestic animals and lead to property damages or personal injuries be considered one of the harms which makes the activity of blasting ultrahazardous, this would still not include the case we have here.

·The relatively moderate vibration and noise which· appellant's blasting produced at a distance of two and a quarter miles was no more than a usual incident of the ordinary life of the community. See 3 Restatement of Torts, 48, § 522, comment a. The trial court specifically found that the blasting did not unreasonably interfere with the enjoyment of their property by nearby landowners, except in the case of respondent's mink ranch.

■ It is the exceedingly nervous disposition of mink, rather than the normal risks inherent in blasting operations, which therefore must, as a matter of sound policy, bear the responsibility for the loss here sustained. We subscribe to the view expressed by Professor Harper (30 Mich. L. Rev. 1001, 1006, *supra*) that the policy of the law does not impose the rule of strict liability to protect against harms incident to the plaintiff's extraordinary and unusual use of land. This is perhaps but an application of the principle that the extent to which one man in the lawful conduct of his business is liable for injuries to another involves an adjustment of conflicting interests. *Exner v. Sherman Power Constr. Co., supra.*

It may very well be that, under the facts of a particular case, recovery for damages of this kind may be sustained upon some theory other than that of absolute liability. In *Hamilton v. King County,* 195 Wash. 84, 79 P. (2d) 697, for example, recovery of such damages was sanctioned on the ground that defendant had trespassed upon plaintiff's land in doing the blasting which caused the disturbance.

Likewise, if the facts warrant, it is possible that such damages may be predicated upon a violation of RCW 70.74.250 [*cf.* Rem. Supp. 1941, § 5440-25], requiring notice to be given at certain times of the year when blasting is to be undertaken within fifteen hundred feet of any fur farm or commercial hatchery, except in certain cases. In *Maitland v. Twin City Aviation Corp.,* 254 Wis. 541, 37 N. W. (2d) 74, where a low-flying airplane frightened mink and loss of kittens resulted, recovery was allowed upon a showing that the airplanes were flown at an unlawfully low elevation.

In *Madsen v. East Jordan Irr. Co.*, 101 Utah 552, 125 P. (2d) 794, recovery was denied under facts very similar to those of the instant case, on the ground that the mother mink's intervention broke the chain of causation.

It is our conclusion that the risk of causing harm of the kind here experienced, as a result of the relatively minor vibration, concussion, and noise from distant blasting, is not the kind of risk which makes the activity of blasting ultrahazardous. The doctrine of absolute liability is therefore inapplicable under the facts of this case, and respondent is not entitled to recover damages.

The judgment is reversed.

GRADY, C. J., MALLERY, FINLEY, and OLSON, JJ., concur.