**In re HANFORD NUCLEAR RESERVATION LITIGATION.**

**No. CV–91–3015–WFN.**

United States District Court, E.D. Washington.

Nov. 3, 2004.

Noreen H. Wynne, Clayton, WA, pro se.

John Strother Moore, Jr., Velikanje, Moore & Shore PS, Yakima, WA, Louise

Roselle, Waite, Schneider, Bayless & Chesley Co., Stanley M Chesley, Waite Schneider Bayless & Chesley Co., Cincinnati, OH, William Randolph Squires, III, Summit Law Group PLLC, James Albert Oliver, David Elliot Breskin, Short, Cressman & Burgess PLLC, Steve W. Berman, Hagens Berman LLP, Tom H. Foulds, Tom Foulds Law Office, Seattle, WA, Kevin T. Van Wart, Kirkland & Ellis, Chicago, IL, William D. Vines, III, Butler Vines & Babb, Knoxville, TN, Gary A. Praglin, Girardi & Keese, Walter J. Lack, Elizabeth L. Crooke, Brian D. Depew, Engstrom, Lipscomb & Lack, Los Angeles, CA, Joseph L. Dunn, Robinson, Phillips & Calcagnie, Newport Beach, CA, Nancy Malee Oreskovich, Nancy Oreskovich Law Office, Beverly Hills, CA, Richard C. Eymann, Steven Lawrence Jones, Eymann, Allison, Fennessy, Hunter & Jones PS, Spokane, WA, Scott A. Johnson, Todd M. Johnson, Johnson Law Group LLP, Minnetonka, MN, Carmela M. Destito–Buttice, Walla Walla, WA, Monica Mitchell, Law Offices of Tom H. Foulds, Flintridge, CA, Kendall S. Zylstra, Berger & Montague, Philadelphia, PA, John Bergland, Roy S. Haber PC, Michael D. Axline, University of Oregon Law School, Eugene, OR, John C. Moore, Tim Quenelle, Moore Law Group PC, Lake Oswego, OR, Michael H. Bloom, Bloom & Schuckman PC, Portland, OR, for Plaintiffs.

David Florian Jurca, Helsell Fetterman LLP, John D. Aldock, Shea & Gardner, Washington, DC, Leslie M. Smith, Marchell M. Michael, Kevin T. Van Wart, Michelle Browdy, Joseph Russell, Carrie Groskopf, Timothy A. Duffy, Kirkland & Ellis, Chicago, IL, Robert M. Loewen, Gibson, Dunn & Crutcher, Newport Beach, CA, Donald A. Bright, Thomas H. Reilly, Atlantic Richfield Co., Los Angeles, CA,

William Randolph Squires, III, Summit Law Group PLLC, David M. Bernick, U.S. Department Of Justice, Washington, DC, for Defendants.

William M. Krause, Lane, Powell, Spears & Lubersky LLP, Seattle, WA, for Amicus.

Gary Neil Bloom, Harbaugh and Bloom, Duane Michael Swinton, Daniel E. Finney, Witherspoon, Kelley, Davenport & Toole, Spokane, WA, for Intervenors.

## ORDER RE: PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT—ABNORMALLY DANGEROUS ACTIVITY

NIELSEN, Senior District Judge.

**This Order relates to: All Cases**

At the tenth status conference on October 28, 2004, the Court reserved ruling on Plaintiffs' Motion for Summary Judgment—Abnormally Dangerous Activity, filed September 9, 2004 (Ct.Rec.1564). Argument was presented by Peter Nordberg for the Plaintiffs and William (Randy) Squires for the Defendants.[1]

The Court has reviewed the file, all materials submitted on the Motion, considered the oral arguments of counsel, and is fully informed. For the reasons stated below, the Motion is granted.

### I. DISCUSSION

The Plaintiffs' Motion requires the Court to determine whether the chemical separation that occurred in the Hanford plutonium production process is an abnormally dangerous activity. The chemical separation created radioactive I–131 that was released into the air by Defendants

---

1. *See* Tenth Status Conference Order: October 28, 2004, filed 11/01/04 (Ct.Rec.1602) for listing of additional counsel present at the hearing.

DuPont and General Electric [2] and allegedly caused thyroid disease in the Plaintiffs. If the activity is abnormally dangerous then the Defendants may be held strictly liable for Plaintiffs' damages, regardless of whether Defendants exercised the utmost care in the conduct of their activities at Hanford.

Plaintiffs have moved for partial summary judgment on this issue of liability pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. A party is entitled to summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party seeking summary judgment must show that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1306 (9th Cir.1982). Here however, the parties are in agreement that the question of whether Defendants' were engaged in an abnormally dangerous activity is a question of law for the court. *Langan v. Valicopters, Inc.*, 88 Wash.2d 855, 861, 567 P.2d 218 (1977). They also agree that the facts upon which the Court must make its legal determination are not facts that a jury must decide. Restatement (Second) of Torts [Restatement] § 520 (1977) Comment 1 (the issue "is no part of the province of the jury to decide"). Thus, since the material facts are generally not disputed, and disagreement is over the inferences to be drawn

from the facts, the Court is permitted to draw the inferences and reach a legal conclusion. If factual disputes exist, the Court is permitted to weigh the facts. The Court will construe all facts in favor of the Defendants as the non-moving party and all justifiable inferences will also be drawn in their favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

The Defendants argue that summary judgment should not be granted because the record is not complete. The Court disagrees. Both parties had sufficient opportunity to present a complete factual record on this dispositive motion. Further, both parties submitted significant documentary evidence in support of their statement of facts. There is enough evidence in the record for the Court to determine the issue.

■ ***Abnormally Dangerous Activity.*** In this Price–Anderson Act [P–AA] action, the substantive rules for decision are derived from state law unless that law is inconsistent with the provisions of § 2210 of the P–AA. 42 U.S.C. § 2014(hh). "In Washington, [the] court has adopted the Restatement (Second) of Torts [Restatement] §§ 519, 520" (1977) which deal with the imposition of strict liability for abnormally dangerous or ultra-hazardous activities. *Langan*, 88 Wash.2d at 860, 567 P.2d 218. Section 519 of the Restatement provides:

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land, or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm the possibility of which

---

**2.** Defendants DuPont and General Electric will be referred to collectively as Defendants in this Order.

makes the activity abnormally dangerous.

Restatement, § 519, p. 34. Section 520 of the Restatement lists the factors to be considered in determining whether an activity is abnormally dangerous:

(a) existence of high degree of risk of some harm to the person, land, or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

Restatement, § 520, p. 36.

■ In determining whether an activity is abnormally dangerous, the Court is to consider all of the factors, but all do not have to weigh equally in favor of characterizing an activity as abnormally dangerous in order for the Court to determine that the activity is subject to strict liability. *Langan*, 88 Wash.2d at 861, 567 P.2d 218. However, one factor alone is not necessarily sufficient for a finding that the activity is abnormally dangerous. *Id.* "The essential question is whether the risk created is so unusual, either because of its magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability for the harm which results from it, even though it is carried on with all reasonable care." *Id.* at 862, 567 P.2d 218, quoting Restatement § 520, comment f. After a review of all the factors which will be discussed *infra*, this Court concludes that this essential question must be answered in the affirmative. Even though the Defendants may have exercised all rea-sonable care in the chemical separation activity, which was necessary to the production of plutonium for the World War II atomic weapons, the risk of harm to the downwind population was so unusual that under Washington law strict liability should be imposed for harm that resulted from the activity.

In Washington, an assessment of the § 520 factors has resulted in the imposition of strict liability for fire work displays, *Klein v. Pyrodyne Corp.*, 117 Wash.2d 1, 810 P.2d 917 (1991); pile driving where injury occurred to the property on an adjacent lot, *Vern J. Oja & Assoc. v. Washington Park Towers, Inc.*, 89 Wash.2d 72, 569 P.2d 1141 (1977); for aerial spraying of crops, *Langan*, 88 Wash.2d 855, 567 P.2d 218; and for a common carriers' transportation of large quantities of gasoline, *Siegler v. Kuhlman*, 81 Wash.2d 448, 502 P.2d 1181 (1972). Under the same analysis of factors of § 520, Washington courts have held that the following activities are not abnormally dangerous including the transmission of electricity, *Dorsch v. City of Tacoma*, 960 P.2d 489, 92 Wash.App. 131 (1998); the selling of handguns, *Knott v. Liberty Jewelry & Loan, Inc.*, 748 P.2d 661, 50 Wash.App. 267 (1988); ground damage caused by the crash landing of aircraft, *Crosby v. Cox Aircraft Co. of Washington*, 109 Wash.2d 581, 746 P.2d 1198 (1987); and the transmission of natural gas, *New Meadows Holding Co. by Raugust v. Washington Water Power Co.*, 659 P.2d 1113, 34 Wash.App. 25 (1983).

In several cases the courts have found activities to not be abnormally dangerous based upon the fact that the harm caused by the activity was not the harm which made the activity abnormally dangerous. Restatement § 519(2). For instance, blasting operations might be held to be abnormally dangerous if harm was caused from flying debris but when minor vibra-

tions and noise frightened a mother mink and caused her to kill her kittens, strict liability was not imposed. *Foster v. Preston Mill Co.*, 44 Wash.2d 440, 268 P.2d 645 (1954). This was because the minor vibrations and noise were not the kind of harm that made the activity ultra-hazardous. Similarly, while explosives and the handling of the same are often considered abnormally dangerous, the courts have held that detonation of explosives that were stolen and transported 300 miles away before being detonated would not result in strict liability for the corporation from whom the explosives were stolen. *Washington State Univ. v. Indus. Rock Products, Inc.*, 37 Wash.App. 586, 681 P.2d 871 (1984). Again, the harm that resulted was not the kind of harm that made the use and storage of the explosives abnormally dangerous. Here, the asserted harm of thyroid disease is one of the harms the possibility of which would make Defendants' chemical separation process abnormally dangerous.

The Court will address each of the factors of § 520.

**(a) High Degree of Risk of Some Harm.** The comment to § 520 related to factors (a) and (b) provides the following regarding the application of these factors:

> An activity that is abnormally dangerous ordinarily involves a high degree of risk of serious harm to the person, land or chattels of another. The harm threatened must be major in degree, and sufficiently serious in its possible consequences to justify holding the defendant strictly responsible for subjecting others to an unusual risk. It is not enough that there is a recognizable risk of some relatively slight harm, even though that risk might be sufficient to make the actor's conduct negligent if the utility of his conduct did not outweigh it, or if he did not exercise reasonable care in conduct-

ing it. If the potential harm is sufficiently great, however, as in the case of a nuclear explosion, the likelihood that it will take place may be comparatively slight and yet the activity be regarded as abnormally dangerous.

Restatement § 520, comment g, p. 38.

■ The focus of inquiry for the Court regarding whether there was an abnormally dangerous activity relates to the activity carried on by the Defendants. Restatement § 520, comment 1, pp. 42–43. The question of whether the activity created a high degree of risk that had serious potential consequences is separate from the question of causation—did the activity actually cause the bellwether Plaintiffs' illness? Thus, even though Defendants assert that the doses were too low to cause illness, that would not mean that there was no risk.

■ The Plaintiffs assert that the release of large quantities of radioactive substances carried a great risk of harm to human health. They argue that the Defendants knew of the releases' risk to health and that even later technology did not prevent emissions of the radioactive substances. The Defendants argue that they would have to have had knowledge based on scientific studies that I–131 caused thyroid cancer and hypo-thyroidism in order to be held strictly liable. Plaintiffs correctly note that the Restatement and Washington cases fail to set forth this highly specific requirement. Even in the negligence context, foreseeability is found if the harm falls within a general field of danger which should be anticipated. *Hetzel v. Parks*, 971 P.2d 115, 93 Wash.App. 929, 938 (1999).

The facts presented by the parties related to this factor are as follows:

■ 1) *Hanford Created I–131 and Released it Into the Air.* It is undisputed that

the plutonium production process included chemical separation which created radioactive I–131 that was released into the air. Most releases of I–131 occurred between December, 1944 and December, 1947. The Hanford Environmental Dose Reconstruction Project [HEDR] estimated that 740,000 curies of I–131 were released between 1944 and 1992. πs' SOF 12–13; Δs' SOF 43.[3]

2) *The Scientific Community Knew of I–131 and Thyroid Connection and Cancer Risk of Radiation.* The state of scientific knowledge was: in 1941 that I–131 would concentrate in the thyroid, πs' R–SOF 2; in the early 1940s that radiation could cause cancer, πs' R–SOF 3 (1942), Ws' R–SOF 6 (1941); and in 1942 that hypothyroidism could follow radiation treatment of the thyroid, πs' R–SOF 6.

3) *Defendants Generally Knew of Physiological Risks.* Both DuPont (in 1943) and General Electric (in 1946) were reluctant to become involved in plutonium production. Δs' SOF 3, 5. Both companies recognized significant potential liability due to physiological hazards resulting from the endeavors and sought to be released from liability. πs' SOF 17, 23.[4]

4) *Defendants Knew of the I–131 and Thyroid Connection.* Specifically, Met Lab scientists working with Hanford noted in March of 1943 that releases of I–131 could cause damage by the concentration of the iodine in the thyroid. πs' SOF 18, 19; *see also* πs' SOF 20, 22. In November 1943, Met Lab recognized that this could result in the possible destruction of the thyroid. Ws' SOF 21. In 1943, Met Lab had a fear

that the iodine would be released and noted that they could protect the thyroid gland from the I–131 by administering potassium iodine pills. πs' R–SOF 9–11. In March, 1944, Met Lab planned medical research projects to look for cancer and other long-term effects of radiation. πs' R–SOF 4.

5) *Defendants Attempted to Control I–131 Emissions with Variable Success.* In addressing the risks, scientists established a safety level of one rad per day of I–131 exposure. Δs' SOF 12–14. They attempted to keep well below the tolerance levels but admitted scattered readings of 2 to 2½ times the tolerance levels. Δs' SOF 15; Defendants' Exh. 7, p. 1. Met Lab recommended to the contractors a cooling time of 54 to 62 days to allow the iodine to decay before chemical separation. πs' R–SOF 13. At the T plant, however, the average cooling time in December, 1944 was 32.7 days. At the same plant in 1945, the cooling time for six months was less than 40 and for nine months was less than 50 days. Similarly, at the B plant in 1945, in six of the nine months of operation the cooling time was less than 40 days and in all nine months was less than 50 days. πs' R–SOF 15.

6) *Defendants Said There Was No Risk with the Emissions but Acknowledged the Need for More Information.* In 1945, Hanford scientists stated that there was no inhalation risk from I–131 and the ingestion of I–131 deposited on plants did not pose a risk to humans. Δs' SOF 18, 19, 24. This same conclusion was drawn in 1948 and 1950 though a danger to grazing

---

3. The parties' Statement of Material Facts are referenced as follows: Plaintiffs' Statement of Facts in Support of their Motion: πs' SOF # ; Defendants' Statement of Facts in Response to Plaintiffs' Motion: Δs' SOF # ; Plaintiffs' Statement of Facts on Reply: πs' R–SOF # .

4. Defendants point out that the contracts were for $1.00 implying that it would not be fair to impose strict liability on a contractor who acted out of a sense of patriotic duty. The Restatement § 520 comment d advises however that strict liability applies even when there is not financial benefit to the actor.

animals was acknowledged. Δs' SOF 21, 22. But more knowledge was admittedly needed to determine what amount of contamination was safe. Defendants' Exh. 25, p. 115. Hanford conducted studies of workers' thyroids in 1945 and found no readings above 1/100th of the thyroid tolerance dose. Δs' SOF 23.

7) *The scientific community was aware and the Defendants likely knew of the milk route risk.* As to the milk route, it was known as early as 1925 that iodine in the diet of milk cows was transferred to their milk. πs' SOF 27. In 1955, the Director of Radiological Science Department at Hanford said that since the first year of Hanford operations, it was known that the permissible levels of radioactive iodine in the atmosphere was too high because ingestion and not inhalation was the problem including "drinking of milk from cows on contaminated pastures," and that for children, the intake of milk should likely be less than two quarts per day. Δs' R–SOF 20; Plaintiffs' Reply Exh. P.

Based upon these facts, the Court concludes that Defendants were engaged in an unusual activity that caused significant early releases of I–131 which in turn created a risk of some harm in the form of illnesses to exposed humans. Whether the risk was very high (as Plaintiffs state) or not very high (as Defendants urge) is immaterial as the potential harm was very serious as will be discussed *infra* so a lower risk is sufficient. Restatement, § 520, comment g, p. 38.

■ **(b) Likelihood That the Harm That Results from it Will Be Great.** The question presented by this factor is whether the harm resulting from emissions of large quantities of I–131 would be serious or major harm, that is harm with serious consequences. *See* Restatement § 520 Comment g, p. 38. Plaintiffs assert that the harm in the form of illness is great

relying upon *In Re: Hanford Nuclear Reservation Litigation,* 292 F.3d 1124, 1137 (9th Cir.2002) ("Radiation is capable of causing a broad range of illnesses, even at the lowest doses.") and R.C.W. 70.99.010 (finding that radioactive wastes are dangerous to the health and welfare of people). The Defendants argue that Plaintiffs aren't specific enough as to the health conditions at issue in this case and have provided no evidence that I–131 causes the conditions. As discussed previously however, the thyroid conditions Plaintiffs allege are within the general type of harm posed by releases of I–131 and evidence on causation is not relevant to the question presented by Plaintiffs' Motion.

The facts presented by the parties related to this factor are as follows:

1) *Bellwether Plaintiffs Received Some Dose of I–131.* This fact is undisputed. πs' SOF 29.

2) *The Hanford Thyroid Disease Study [HTDS] Shows the Same Risk of Thyroid Disease Regardless of Dose and There Doesn't Appear to Be an Increased Risk of Thyroid Disease from Exposure to I–131.* ys' SOF 31. As discussed under factor a, the harm potentially associated with I–131 is thyroid disease which has been described as serious and includes cancer. An Environmental Protection Agency publication presented by the Defendants also states "[l]ong term (chronic) exposure to radioactive iodine can cause nodules, or cancer of the thyroid. Δs' Exh. 34, p. 4." Although the HTDS found no increase in disease (which relates to the likelihood Plaintiffs' diseases were caused by Hanford emissions), that doesn't negate the proposition that the potential harms were serious for purposes of an abnormally dangerous activity evaluation under factor b. The Court concludes that the I–131 emis-

sions could result in potentially serious illnesses with serious consequences.

 (c) **Inability to Eliminate the Risk by the Exercise of Reasonable Care.** The Restatement comments advise that

> Most ordinary activities can be made entirely safe by the taking of all reasonable precautions; and when safety cannot be attained by the exercise of due care there is reason to regard the danger as an abnormal one.
>
> There is probably no activity, unless it is perhaps the use of atomic energy, from which all risks of harm could not be eliminated by the taking of all conceivable precautions, and the exercise of the utmost care, particularly as to the place where it is carried on. Thus almost any other activity, no matter how dangerous, in the center of the Antarctic continent, might be expected to involve no possible risk to anyone except those who engage in it. It is not necessary, for the factor stated in Clause (c) to apply, that the risk be one that no conceivable precautions or care could eliminate. What is referred to here is the unavoidable risk remaining in the activity, even though the actor has taken all reasonable precautions in advance and has exercised all ·reasonable care in his operation, so that he is not negligent.

Restatement § 520 comment h, pp. 38–39. In sum, an operation that exercises due care to control risks and can do so is an ordinary activity while the operation that cannot control all risks is an abnormal activity.

Plaintiffs argue that the Defendants have impliedly admitted that they could not control the risk of I–131 releases because Defendants assert they were not negligent and contend that they set cooling temperatures at the safest practical level to reduce emissions yet the emissions occurred. The Defendants respond that since I–131 has a half life of eight days, longer cooling times could have reduced the risk of I–131 emissions, thus the risk was avoidable. It was only because shorter cooling times were used so that the plutonium could be produced faster for military uses that I–131 was emitted.

The facts presented on this factor establish that:

1) *Defendants Acted Prudently.* Project engineers acted prudently and reasonably and alternative technologies suggested by the Plaintiffs were not reasonably available or inappropriate for reducing emissions. πs' SOF 35.

2) *Longer Cooling Time would Reduce I–131 Emissions.* Longer cooling times could reduce the volume of I–131 emitted. Ws' SOF 36.

3) *Military Demand for Plutonium Required Shorter Cooling Times.* Given the need for plutonium for atomic weapons the cooling times were often shorter than desirable to reduce I–131 emissions. Δs' SOF 34; πs' R–SOF 14–15.

While longer cooling times could have theoretically reduced emissions of I–131, that outcome was impossible to achieve given the pressure to produce the plutonium for the war effort. Under the actual circumstances in which this I–131 was created, the risk of emissions was unavoidable. The Court concludes that this factor weighs in favor of a finding of an abnormally dangerous activity.

**(d) Extent to Which the Activity Is Not a Matter of Common Usage.** The Restatement comment provides the following guidance in assessing this factor:

> An activity is a matter of common usage if it is customarily carried on by the great mass of mankind or by many people in the community.... Certain activi-

ties, notwithstanding the recognizable danger, are so generally carried on as to be regarded as customary. Thus automobiles have come into such general use that their operation is a matter of common usage....

Although blasting is recognized as a proper means of excavation for building purposes or of clearing woodland for cultivation, it is not carried on by any large percentage of the population, and therefore it is not a matter of common usage.

Restatement § 520 comment I, pp. 39–40.

Plaintiffs argue that the production process certainly was not a common usage during the time period at issue in this case. In response, the Defendants argue that while the production of plutonium for use in atomic weapons was not a common activity, the chemical separation and air dilution and venting through a tall stack were common endeavors based on the science of the time. As to I–131, the Defendants argue also that existing knowledge was used to make the emissions safe.

The undisputed facts are as follows:

1) *Plutonium Production was a Totally New Endeavor.* Plutonium production operations were an entirely new endeavor. Ws' SOF 40.

2) *Chemical Separation Used in Other Settings.* Chemical separation techniques had been used in other industrial settings. ys' SOF 35.

3) *X–Ray Radiation Used in Medical Diagnosis and Treatment.* X-ray radiation had been used in the 1960s to treat thyroid disease and specifically I–131 continues to be used in nuclear medicine. Δs' SOF 36.

Although radiation had seen medical usage and chemical separation had been used before, it is still undisputed that the weapons grade plutonium production which in-cluded chemical separation that released I–131 was an .activity in which few people were engaged. As such it was not one of common usage and this factor weighs in favor of a finding of an abnormally dangerous activity.

**(e) Inappropriateness of the Activity to the Place Where it Is Carried On.** The Restatement provides the following guidance on this factor:

Another factor to be taken into account in determining whether an activity is abnormally dangerous is the place where it is carried on. If the place is one inappropriate to the particular activity, and other factors are present, the danger created may be regarded as an abnormal one.

Even a magazine of high explosives, capable of destroying everything within a distance of half a mile, does not necessarily create an abnormal danger if it is located in the midst of a desert area, far from human habitation and all property of any considerable value.

Restatement § 520 comment j, p. 41.

The question presented on this issue is whether the location of Hanford was inappropriate for the activity to be conducted. Plaintiffs do not dispute that the location for Hanford may have been as safe as any in the continental United States. They argue, however, that if an activity will pose great health risk wherever it is conducted, this factor should weigh in favor of a finding of an abnormally dangerous activity. The Defendants assert that the Plaintiffs have no evidence that the activity posed a grave health risk or would be dangerous wherever sited.

The. undisputed fact specifically identified as to this factor is that: *Hanford Was Sited at the Only Good Location that Could Be Found.* πs'; Δs' SOF 37.

 The fact that Hanford may have been the only good location for the activity is not dispositive of the question of whether the site was appropriate for the activity of chemical separation that would undisputedly release I–131 into the air. In the Washington case of *Langan v. Valicopters,* an organic farming enterprise was harmed by aerial spraying on adjacent land. 88 Wash.2d at 858–59, 567 P.2d 218. Obviously the spraying had to be done where it was, i.e., from a practical standpoint it was the only place to do it to benefit the adjacent landowner. But "[g]iven the nature of organic farming, the use of pesticides adjacent to such an area must be considered an activity conducted in an inappropriate place." *Id.* at 864, 567 P.2d 218.

Similarly here, practically speaking Hanford was likely the best site. But given the potential risk of I–131 exposure resulting in possible disease to those downwind of the facility, the placement of the chemical separation process at Hanford must be considered an activity conducted in an inappropriate place for the purposes of an abnormally dangerous activity evaluation. It would be anomalous for the Court to hold otherwise and have this factor weigh against finding an abnormally dangerous activity given the undisputed fact that downwinders did receive doses of I–131 from the Hanford facility.

(f) **Extent to Which its Value to the Community Is Outweighed by its Dangerous Attributes.** The Restatement § 520 provides guidance on the evaluation of this factor as follows:

Even though the activity involves a serious risk of harm that cannot be eliminated with reasonable care and it is not a matter of common usage, its value to the community may be such that the danger will not be regarded as an abnormal one. This is true particularly where the community is largely devoted to the danger-

ous enterprise and its prosperity largely depends upon it.

Restatement, § 520, comment k, p. 42.

The Restatement also notes that

The utility of [the actor's] conduct may be such that he is socially justified in proceeding with his activity, but the unavoidable risk of harm that is inherent in it requires that it be carried on at his peril, rather than at the expense of the innocent person who suffers harm as a result of it.

*Id.* at comment h, p. 39.

This factor requires the Court to do a risk benefit analysis, but as comment h indicates, policy considerations about who should bear the risk also are relevant.

The Plaintiffs do not dispute Hanford's contribution to the United States' victory in World War II. They point out, however, that the entire nation benefited while only the people surrounding Hanford bore the health risks, that were not knowingly or voluntarily accepted by this community. Plaintiffs argue that "if injury to some was the necessary price for a benefit to the many, the just course is to be glad of the benefit while compensating the injured." Plaintiffs' Memo. filed 9/08/04 (Ct.Rec. 1564) at p. 11. Defendants agree that plutonium production was a socially justified activity. They argue that the risks were not great as the separation process "was conducted in a manner that ensured that any risks associated with the emission of I–131 were negligible." Defendants' Response filed 9/29/04 (Ct.Rec.1576) at p. 17.

The fact related to this factor is: *The Hanford Operation Played a Critical Role in Bringing World War II to a Successful End in August, 1945.* Δs' SOF 39.

The chemical separation process for plutonium production which resulted in the release into the air of I–131 presented a

risk of serious illness to people living in the downwind areas. The risk could not be eliminated with reasonable care given the high war demand for the plutonium and the activity is not a matter of common usage. That said, Hanford's value to the national community was high. If only the downwind area had benefited from the Defendants' activity, this factor might weigh against a finding of an abnormally dangerous activity. In this case, however, the benefit accrued to the entire nation but the risk and the potential harm was endured only by the people downwind of Hanford. Policy considerations support that this factor be weighed in favor of finding the Defendants' activities to be abnormally dangerous. The innocent people who can prove they suffered harm should be compensated by the entire nation who benefited from the activity. This is consistent with the Congressional intent underlying the P–AA.

In sum, the Court concludes that the six factors of Restatement § 520 weigh in favor of a finding that the Defendants were engaged in an abnormally dangerous activity which allows the imposition of strict liability under Washington law. The Court's inquiry does not end at this point however, as Defendants have raised two arguments why strict liability may not be imposed on them.

*Public Duty.* Defendants, assert that they may not be held strictly liable because they acted pursuant to a public duty. Defendants cite, *inter alia,* Restatement (Second) of Torts § 521 and *Lamb v. Martin Marietta Energy Sys., Inc.,* 835 F.Supp. 959 (W.D.Ky.1993). Plaintiffs counter that Washington has never adopted § 521 and even if it had, the Defendants would not fit within the plain

terms of the section because they are not public officers or employees or common carriers.

Restatement § 521 provides:

The rules as to strict liability for abnormally dangerous activities do not apply if the activity is carried on in pursuance of a public duty imposed upon the actor as a public officer or employee or as a common carrier.

Restatement § 521, p. 46.

█ A justifiable inference may be drawn that Defendants were fulfilling a "public duty." It is not disputed that the plutonium production by Defendants was at the direct request of the government and was important, if not critical, to the nation's defense. Still, the fact that Defendants were engaged in a public duty does not necessarily mean that the public duty exception to strict liability would be applicable here.

On a Price–Anderson Act [P–AA] claim "the substantive rules for decision ... shall be derived from the law of the State in which the nuclear incident involved occurs ...." 42 U.S.C. § 2014(hh). In this case, the substantive law of Washington is applied. Some states, such as Kentucky, have adopted § 521 of the Restatement and found public officers and common carriers to not be subject to strict liability. *See, e.g., Kentucky Utilities Co. v. Auto Crane Co.,* 674 S.W.2d 15, 18 (Ky.App. 1983) (the transmission of electricity is a public necessity and not subject to strict liability as abnormally dangerous activity citing § 521). Other states, such as Washington, have not adopted § 521.[5] In dealing with a common carrier of gasoline who caused a fatal accident from a spill, the Washington court held the common carrier

---

**5.** Defendants do not cite, nor could the Court find, any Washington case that applied Restatement (Second) of Torts § 521.

strictly liable under § 520 of the Restatement. *Siegler v. Kuhlman,* 81 Wash.2d 448, 502 P.2d 1181 (1972). A California federal district court cited *Siegler* in holding a railroad strictly liable for an explosion caused by bombs being carried under contract with the Navy. *Chavez v. So. Pacific Transp. Co.,* 413 F.Supp. 1203, 1214 (E.D.Cal.1976). The court explained that common carriers engaged in abnormally dangerous activities were held strictly liable for harm caused from the activity based upon the rationale that the carrier could distribute that loss to the public. *Id.* at 1214. "The harsh impact of inevitable disasters is softened by spreading the cost among a greater population and over a longer time period. A more efficient allocation of resources results." *Id.* The Washington court's failure to apply § 521 in the *Siegler* case, and the spreading of the loss rationale support Plaintiffs' argument that Washington has not adopted § 521 of the Restatement so it is not applicable to Defendants' on this Motion.

In addition, Plaintiffs argue persuasively that even if Washington had adopted § 521 of the Restatement, the section would not be applicable to the Defendants because they are not public officers or employees or a common carrier. Even though the Defendants may have been operating under contract with the government, that would not preclude them from being held strictly liable. *See Lobozzo v. Adam Eidemiller, Inc.,* 437 Pa. 360, 263 A.2d 432 (1970) (highway construction contractor was strictly liable for damage to adjacent property caused by blasting even though the governmental entity's plans and specifications required the blasting). Defendants' citation to *Lamb* provides little strength to their argument that Defendants may not be held strictly liable under § 521. Defendants cite the case for an alternate holding and that holding was based on Kentucky law, a state which had

adopted § 521 and the public duty exception to strict liability, not Washington law. *Lamb,* 835 F.Supp. at 971. The court made this alternate determination without addressing whether the contractor was a public officer or employee or common carrier. *Id.*

In the *Lobozzo* case, the court explained the rationale for excepting public officers or employees from strict liability. Such a person has a duty to conduct activities assigned by his or her government employer even if the activity was abnormally dangerous. The government may be immune to suit if the activity causes harm to the public but the public servant may not share the immunity. The court reasoned that the public servant should not be held liable when he is not in a position like that of an independent contractor who could balance the risks and contract with the government accordingly. *Lobozzo,* 263 A.2d at 434. Here, the Defendants were independent contractors who were undisputedly aware of the risks of the activity and did contract accordingly. πs' SOF 17, 23; Δs' SOF 3, 5. The Court concludes that the public duty exception to strict liability (Restatement § 521) is not applicable to the Defendants.

■ *Preemption of State Standard* Defendants also argue that the Washington strict liability standard is preempted by federal regulations. Defendants assert that all federal circuits that have addressed the issue have concluded that the P–AA preempts states from imposing non-federal duties in tort for alleged injuries arising from nuclear incidents and that federal, not state, law provides the liability standard for claims arising under the Act. Plaintiffs respond first that there were no federal regulations at the time of the Defendants' releases at issue in this case, only tolerance doses that the operators

consulted for practical guidance. Second, Plaintiffs assert that the cases cited by the Defendants from other circuits were wrongly decided as explained by Judge Kane in *Cook v. Rockwell Int'l Corp.*, 273 F.Supp.2d 1175 (D.Colo.2003).

Defendants request that the Court infer from the facts presented that the tolerance doses established by scientists working with the Defendants were federal safety regulations governing releases from nuclear facilities at the time of the early emissions of I–131 from Hanford. These standards, the Defendants argue, should preempt Washington standards. It is undisputed that Met Lab scientists working with the Defendants established tolerance doses for human exposure. As' SOF 12. The Defendants suggested inference is not justifiable for two reasons. First, the tolerance doses were not emissions standards. Doses received by individual Plaintiffs relate to the causation question, not to the Defendants' activity resulting in emissions. Second, the Atomic Energy Commission in a 1945 article noted that these doses had no legal status. Plaintiffs' Reply Exh. N, p. 18. The tolerance doses were practical guidelines not legally binding federal regulations. The Court concludes that no federally-established regulations existed in the early years of Hanford emissions of I–131. Thus no standards would exist to test the Plaintiffs' claims against if the Washington law of strict liability was preempted. Here, from a purely practical standpoint federal law does not preempt state strict liability standards.

From a legal standpoint the Court also concludes that even if the tolerance doses were construed as federal regulations they would not preempt the Washington standard of strict liability. Unfortunately, there is no Ninth Circuit authority on this issue. The most relevant Supreme Court authority is found in *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984). *Silkwood* addressed claims of the estate of a deceased lab analyst at a federally licensed nuclear facility brought under state tort law to recover for plutonium contamination to the analyst's person and property. The jury awarded, *inter alia*, punitive damages and the Supreme Court upheld the award. *Silkwood*, 464 U.S. at 258, 104 S.Ct. 615. Although this was not a P–AA claim, as the Supreme Court noted, it discussed the P–AA at length. *Id.* at 251–56, 104 S.Ct. 615. The court's conclusion is significantly probative on the issue before this Court.

In sum, it is clear that in enacting and amending the Price–Anderson Act, Congress assumed that state-law remedies, in whatever form they might take, were available to those injured by nuclear incidents. This was so even though it was well aware of the NRC's exclusive authority to regulate safety matters. No doubt there is a tension between the conclusion that safety regulation is the exclusive concern of the federal law and the conclusion that a state may nevertheless award damages based on its own law of liability. But as we understand what was done over the years in the legislation concerning nuclear energy, Congress intended to stand by both concepts and to tolerate whatever tension there was between them. We can do no less. It may be that the award of damages based on the state law of negligence or strict liability is regulatory in the sense that a nuclear plant will be threatened with damages liability if it does not conform to state standards, but that regulatory consequence was something that Congress was quite willing to accept.

We do not suggest that there could never be an instance in which the federal law would preempt the recovery of dam-

ages based on state law. But insofar as damages for radiation injuries are concerned, preemption should not be judged on the basis that the federal government has so completely occupied the field of safety that state remedies are foreclosed but on whether there is an irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law. We perceive no such conflict or frustration in the circumstances of this case.

*Id.* at 256, 104 S.Ct. 615.

The Defendants suggest that the *Silkwood* decision was wrongly decided. It appears unlikely that the Supreme Court is withdrawing from its holding that incidental regulatory effects are permissible and only direct state regulation of safety aspects of nuclear energy are preempted. The holding has been cited in several more recent Supreme Court cases, one allowing state workers' compensation awards to employees at a nuclear production facility, *Goodyear Atomic Corp. v. Miller,* 486 U.S. 174, 185–86, 108 S.Ct. 1704, 100 L.Ed.2d 158 (1988), and in another precluding preemption by the federal Energy Reorganization Act of state law claims for intentional infliction of emotional distress of a nuclear fuel production facility worker. *English v. GE Co.,* 496 U.S. 72, 85–86, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Most recently the Supreme Court, in discussing its earlier *Silkwood* decision, noted the clear Congressional intent that supported the *Silkwood* decision to not preempt state remedies such as punitive damages. *Buckman Co. v. Plaintiffs' Legal Comm.,* 531 U.S. 341, 351–52, 121 S.Ct. 1012, 148 L.Ed.2d 854 (2001).

The *Silkwood* decision predated the 1988 Amendments Act to the P–AA. The

Amendments Act expanded original and removal jurisdiction creating a federal cause of action for any action arising from a nuclear incident. 42 U.S.C. § 2210(n)(2). Congress also directed that the state law would provide the rules of decision "unless such law is inconsistent with provisions of such section [referring to 42 U.S.C. § 2210, the Price–Anderson Act]." 42 U.S.C. § 2014(hh). Two circuits, the Third and the Seventh, heavily relied upon by the Defendants, addressed the constitutionality of the Amendments Act and found that Congress had not exceeded its Article III authority. *In re TMI Litigation Cases Consol. II,* 940 F.2d 832 (3d Cir.1991); *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir.1994). Had these cases found otherwise, the federal compensatory scheme would have been stricken. Instead, in *TMI* the court found that the P–AA removal provision was constitutional so that the personal injury claims related to the TMI incident were properly removed from state to federal court. 940 F.2d 832. The *O'Conner* case relied on *TMI* and similarly found a nuclear power plant worker's state claim for negligent exposure to radiation which caused injury properly removed to federal court. 13 F.3d 1090. Summary judgment was granted to the defendants in the *O'Conner* case because the worker could not show that federal safety standards regarding permissible radiation doses were exceeded. 13 F.3d at 1107.

Both *TMI* and *O'Conner* found the Amendments Act constitutional using a field preemption analysis, observing that the federal government occupied the whole field of nuclear safety and thus state law was preempted if it acted in any way regulated by the Act. *TMI,* 940 F.2d at 858; *O'Conner,* 13 F.3d at 1101. *O'Conner* in addition held that federal nuclear safety standards would establish the standard of

care as opposed to state standards which were preempted. *O'Conner*, 13 F.3d at 1104. Plaintiffs assert that these cases were wrongly decided and cite Judge Kane's lengthy and scholarly order in *Cook v. Rockwell Int'l Corp. and Dow Chemical Co.*, 273 F.Supp.2d 1175 (D.Colo.2003). Judge Kane concluded that federal nuclear safety regulations did not preempt state standards of care in P–AA public liability actions. *Cook*, 273 F.Supp.2d 1175. He did so only after a comprehensive review of federal preemption and the history of the P–AA including the Amendments Act. He recognized his conclusion was at odds with the authority of *TMI* and *O'Conner* but found that these cases were contrary to the Supreme Court rulings in *Silkwood*, the plain language of the Amendments Act, and the Congressional intent surrounding the P–AA. *Cook*, 273 F.Supp.2d at 1193–99.

In reviewing *TMI* and *O'Conner*, Judge Kane correctly observed that the use of field preemption was in violation of the Supreme Court direction in *Silkwood* that preemption in radiation injury claims should not be based on the fact that the federal government so completely occupied the field of safety that state remedies were foreclosed. *Cook*, 273 F.Supp.2d at 1194. Judge Kane also correctly observed that both *TMI* and *O'Conner* violated the *Silkwood* binding determination of Congressional intent at least as to the pre–1988 amendments. *Id.* at 1194. In addition, the *O'Conner* court justified federal preemption of state standards by asserting that federal nuclear safety standards are part of the P–AA statutory scheme. *O'Conner*, 13 F.3d at 1095. As Judge Kane points out, that contradicts the plain language of § 2014(hh) which provides that state law provides the rule of decision unless state law is inconsistent with the Act. *Id.* The Act, § 2210, does not incorporate any federal safety regulations. Fur-

ther, the legislative history of the 1988 Amendments Act does not support any Congressional intent to incorporate federal safety regulations and to preempt state law. *Id.*

In *Silkwood*, the Supreme Court determined that an award of punitive damages did not create an irreconcilable conflict between federal and state standards and did not frustrate the objectives of federal law. *Silkwood*, 464 U.S. at 257–58, 104 S.Ct. 615. The Washington strict liability law would similarly not create an irreconcilable conflict between federal and state standards or frustrate the objectives of federal law.

Based upon the P–AA compensatory purpose and the plain language of § 2014(hh) of the Amendments Act that state law applies, the Court concludes that Judge Kane's analysis of preemption is correct. The P–AA does not require that federal safety regulations establish the standard of care and preempt state tort remedies. The progeny of *TMI* and *O'Conner* repeat the questionable analysis of these cases. *Nieman v. NLO, Inc.*, 108 F.3d 1546 (6th Cir.1997); *Roberts v. Florida Power & Light Co.*, 146 F.3d 1305 (11th Cir.1998) (*per curiam*). Other cases, as Judge Kane points out, just accept the questionable preemption analysis and cite the above cases. *Cook*, 273 F.Supp.2d at 1199, referencing *Good v. Fluor Daniel Corp.*, 222 F.Supp.2d 1236, 1247 (E.D.Wash.2002); *see also McLandrich v. Southern California Edison Co.*, 942 F.Supp. 457, 465–66 (S.D.Cal.1996); *Bohrmann v. Maine Yankee Atomic Power Co.*, 926 F.Supp. 211, 218 (D.Me.1996).

## II. CONCLUSION

Plaintiffs brought a motion for partial summary judgment on the issue of whether Defendants were engaged in an abnor-

mally dangerous activity and thus strictly liable. Although Defendants were fulfilling a public duty, § 521 of the Restatement does not operate to preclude an application of strict liability. In addition, the P–AA requires that the substantive law of the State be applied, and this law is not preempted by any federal law. In Washington strict liability is applied if Defendants are engaged in an abnormally dangerous activity. The Restatement factors of § 520 weigh in favor of a finding that the Defendants' were engaged in an abnormally dangerous activity.

Even though Defendants likely made their best efforts to minimize risk the war effort required that safety take a second seat to plutonium production. Defendants argue they should not be held strictly liable if they did nothing wrong. The Court's determination is not that Defendants did anything wrong, only that they were engaged in an activity that was abnormally dangerous and that in such cases Defendants can spread the risk more equitably allowing those who sustained harm to recover without having to prove that Defendants were negligent. The remaining issue for trial is whether Defendants' activities caused the Plaintiffs' alleged damages. Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment—Abnormally Dangerous Activity, filed September 9, 2004, **Ct. Rec. 1564**, is **GRANTED**.

The District Court Executive is directed to file this Order and provide copies to Liaison Counsel; Mediator Gary Bloom; **AND TO** pro se Plaintiffs Noreen L. Wynne, Carmela M. Destito–Buttice (for late John P. Destito, Jr.), and Marylin F. Mlnarik.